**Allen WILLIAMS, Plaintiff,**

v.

**UNITED STEEL WORKERS OF AMERICA, AFL–CIO/CLC, Defendant.**

**No. CIV.1:01–CV–00572.**

United States District Court, M.D. North Carolina.

Oct. 31, 2002.

Romallus O. Murphy, Greensboro, NC, for Plaintiff.

Allen Williams, Albemarle, NC, pro se.

Jonathan R. Harkavy, Patterson Harkavy & Lawrence, Greensboro, NC, Richard P. Rouco, Whatley Drake, L.L.C., Birmingham, AL, for Defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

On June 6, 2001, Plaintiff, Allen Williams ("Plaintiff"), former president of Local 303, filed this action against Defendant United Steel Workers of America, AFL–CIO/CLC ("Defendant", "USWA", or "International"), an International Union. On September 13, 2001, Plaintiff filed an amended complaint against Defendant seeking declaratory and injunctive relief as well as damages. Plaintiff alleges that Defendant placed Local 303 under administratorship and removed him from office because of his race and in retaliation for his views on the Confederate flag in violation of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq.* (1988), specifically 29 U.S.C. §§ 411(a)(2), 412, and 529. Plaintiff also alleges discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981").

This matter is before the court on a motion for summary judgment by Defendant. For the following reasons, the court will grant Defendant's motion for summary judgment.

## FACTS

Prior to Local 303 being placed under administratorship, Plaintiff, an African–American male, served as president of Local 303. Plaintiff, along with the entire executive board, was elected to office in April 2000 and took office in May 2000. Plaintiff was employed by Aluminum Company of America ("Alcoa") during all relevant time periods of this lawsuit and re-

mains an employee of Alcoa.[1] During Plaintiff's brief tenure as president of Local 303, he was involved in a controversy concerning the Confederate flag and also experienced difficulties with the elected executive board.

### A. Confederate Flag Controversy

Prior to Plaintiff taking office as president of Local 303, African–American union members and workers complained about Confederate flags being displayed on vehicles in the Alcoa parking lot. After taking office, Plaintiff determined that this activity violated Alcoa's Rules of Conduct and insisted that Alcoa enforce its policy. Some Caucasian union members and workers objected to Plaintiff's initiative on the Confederate flag. Plaintiff alleges that Joe Weber, a USWA employee, and Homer Wilson, director of District Nine of the USWA, in or around September 2000, told Plaintiff to "leave the Confederate flag alone." (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 39).

### B. Executive Board Conflicts

Conflicts between the executive board of Local 303 and Plaintiff arose shortly after Plaintiff assumed the position of president in May 2000. Between May 2000 and November 6, 2000 (the date Plaintiff was removed from office as a result of Local 303 being placed under administratorship), Plaintiff removed numerous executive board members from their committee assignments.

On June 9, 2000, Plaintiff decided to abolish several committee positions and remove several executive board members from their committee assignments. Plain-

tiff initially decided to remove six members from the joint safety and health committee, leaving himself as the only member of that committee. Plaintiff also decided to remove all members, except himself and Lowell Frick (vice president of Local 303), from the plant-wide steering committee. Plaintiff did not consult with the executive board concerning these decisions. After meeting with the executive board, Plaintiff decided not to implement these changes. According to Frick, Plaintiff's actions created difficulties between Local 303 and Alcoa because there was uncertainty regarding committee assignments.

Also, in or around June 2000, Plaintiff established three new Local 303 funds: picnic, charity, and strike and lockout. These funds were to be financed through donations and pledges from Local 303 members, and no union dues were to be used to finance these funds. At an executive board meeting on September 5, 2000, several board members raised questions concerning the legality of these funds. Following a motion to suspend and discontinue the funds until any questions were resolved, all board members present voted in favor of the motion.[2]

Shortly after the September 5, 2000, meeting, Plaintiff removed from their committee assignments the executive board members who were present and voted for the motion with the exception of Lowell Frick. Although the decision to discontinue the picnic, charity, and strike and lockout funds was unrelated to any committee assignments, Plaintiff removed these members from their committee assignments because they voted to discontinue the funds established by Plaintiff. Following pressure from Homer Wilson, director of Dis-

---

**1.** Plaintiff was paid an honorarium of $62.50 per month (and a $125.00 expense check) to serve as president of Local 303.

**2.** Frankie Morrow was the only board member absent from the September 5, 2000, meeting.

trict Nine of the USWA, to reconsider his decision, Plaintiff agreed to allow Teddy Starnes to sit on the benefits committee but refused to make any other changes.[3]

Prior to September 2000, the executive board and Plaintiff had substantial difficulty working together. O.T. Love, an African–American executive board member, avers that "[Plaintiff] wanted to run all the committees and anyone who disagreed with him was threatened with removal. He also threatened to eliminate committees if the company did not agree with his position on any given issue." (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Love Aff. ¶ 5.) Furthermore, several executive board members aver that union members threatened to quit Local 303 if the stalemate between the executive board and Plaintiff was not resolved. Plaintiff concedes that executive board members referred to him as a "dictator." (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 186.)

According to executive board members, during the period between September 8, 2000, and November 6, 2000, Local 303's committees simply were not functioning. Love avers that he informed Plaintiff on numerous occasions that Local 303 was not handling grievances and that safety in the plant had deteriorated because the joint safety and health committee was not functioning. Love further avers that Local 303 was not enforcing substantial elements of the bargaining contract and that Plaintiff was having problems filling the vacant committee assignments.

## C. *Proceedings*

In or around August 2000, several Local 303 union members filed internal charges against Plaintiff alleging that Plaintiff failed to represent all union members in a fair and impartial manner by siding with African–American workers and union members concerning the Confederate flag. At the resulting hearing, Plaintiff testified that he recorded license plate numbers of vehicles displaying the Confederate flag in the company parking lot and that he gave this information to an attorney representing African–American employees suing Alcoa for racial discrimination. On August 15, 2000, the Local 303 trial committee found that Plaintiff failed to represent all members of Local 303 and held that Plaintiff violated Article IX, Section 1 by "furnishing a complete or partial list of the membership of the International Union or of any Local Union to any person other than those whose official position entitles them to have such a list." (Pl.'s Resp. to Summ. J. Mot. at Ex. 1, Trial Comm. Rep. at 2.) The trial committee recommended that Plaintiff voluntarily resign or be removed from office, which would become effective upon a majority vote of the members present at the Local 303 meeting. On September 5, 2000, the union membership of Local 303 accepted and approved the trial committee report. On September 25, 2000, Plaintiff appealed this decision to the USWA Secretary and Treasurer, Leo Gerard. The International commission accepted the appeal and set a hearing for October 13, 2000.

An International commission ("Anderson International Commission"), appointed by USWA president George Becker and consisting of Morris Anderson, conducted a hearing on October 13, 2000, in relation to Plaintiff's appeal of the Local 303 trial committee's findings. In an opinion filed October 20, 2000, the Anderson International Commission concluded that Plaintiff should not have given license plate num-

---

**3.** Plaintiff had appointed each of the board members to their committee assignments, with the exception of Teddy Starnes, who was appointed to the benefits committee by Alcoa.

bers of vehicles displaying the Confederate flag in the company parking lot to an attorney and that Plaintiff should not have removed executive board members from their committee assignments because they voted against him. The Anderson International Commission recommended that Local 303 be placed under administratorship, which was submitted to the International Executive Board Appeal Panel ("International Appeal Panel"). On October 31, 2000, Homer Wilson also recommended that Local 303 be placed under administratorship.[4] On November 6, 2000, George Becker, USWA president, placed Local 303 under administratorship and appointed Joe Weber, the USWA employee responsible for servicing Local 303, as the administrator of Local 303. On November 8, 2000, Becker notified Local 303's officers that they had been suspended and that Local 303 was placed under administratorship.

Within sixty (60) days of the imposition of the administratorship, Becker appointed a commission composed of John Herron and Gary Graves (the "Herron–Graves International Commission") to investigate the propriety of maintaining the administratorship and to conduct a hearing and prepare a report for Becker and the International Appeal Panel. The Herron–Graves International Commission conducted a hearing on January 3, 2001. At this hearing, each of the executive board members present, with the exception of Plaintiff, agreed that the administratorship was proper. O.T. Love, Samuel Butler, and Frankie Morrow (African–American executive board members of Local 303) testified that Local 303 needed to be placed under administratorship because of Plaintiff's actions concerning committee assignments and Plaintiff's mistrust of the executive board. On the other hand, Plaintiff testi-

fied that the turmoil in Local 303 was caused by his position on the Confederate flag. On January 9, 2001, the Herron–Graves International Commission acknowledged Plaintiff's unilateral removal of committee members and concluded that "[r]egardless of the reasons of the turmoil, the Administratorship was necessary to assure the performance of the [collective bargaining agreement and] to restore the democratic procedures as outlined by the Constitution." (Pl.'s Resp. to Summ. J. Mot. at Ex. 4, Comm'n Report at 3.) The Herron–Graves International Commission recommended that Local 303 continue under administratorship.

On February 14, 2001, the International Appeal Panel, acting on the appeal of the earlier (October 20, 2000) recommendation of the Anderson International Commission, reversed the action of the Anderson International Commission recommending Plaintiff be removed from office on the grounds that he recorded members' license plate numbers displaying the Confederate flag and provided those numbers to persons other than those whose official position entitled them to have such information. The International Appeal Panel did not address the issue of placing Local 303 under administratorship in this opinion. Later, on or about August 1, 2001, the International Appeal Panel affirmed Becker's November 6, 2000, decision to place Local 303 under administratorship.

### D. Administratorship

The decision to place a local union under administratorship is made by the president of the USWA and is subject to review by the USWA's executive board. When a local union is placed under administratorship, the International assumes control of the local union and all of the local's officers

---

4. As director of District Nine of the USWA, Homer Wilson may make recommendations concerning the imposition of an administratorship on USWA Locals within District Nine.

are removed from office. The administrator appointed by the USWA president may appoint local union officers to acting positions to assist the administrator in running the local union. A local union may be placed under administratorship if it is unable to carry out its bargaining and representational obligations. 29 U.S.C. § 462.

When he placed Local 303 under administratorship on November 6, 2000, USWA president Becker appointed Joe Weber as the administrator of Local 303 and suspended Local 303's officers, including Plaintiff. To assist in the operation of Local 303, Weber appointed all the former executive board members to acting positions (including their prior committee assignments), with the exception of Plaintiff. Three of the executive board members appointed to assist Weber are African–American. Furthermore, Plaintiff concedes that at least two African–American board members, O.T. Love and Frankie Morrow, did not support the display of the Confederate flag. (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 186–87.) Because Lowell Frick (Caucasian) had been vice president of Local 303 prior to the administratorship, Weber appointed Frick as acting president. Weber avers that he did not appoint Plaintiff because Plaintiff's refusal to work with other executive board members resulted in the imposition of the administratorship.

An election for all executive board positions, including Local 303 president, was scheduled for May 29, 2002. After the election, control of Local 303 was to be returned to Local 303's elected executive board. Plaintiff intended to run for the office of Local 303 president.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

### A. *Labor–Management Reporting and Disclosure Act*

■ Plaintiff avers that he was suspended and not reappointed [5] to the office of president because of his views concerning the Confederate flag and that an August 11, 1999, resolution of the International Executive Board prohibits retaliation against members for asserting their civil rights, regardless of whether such rights are asserted using the union's internal procedure, contractual provisions, or external statutory procedures. Plaintiff argues that such an improper motive violates Section 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), and Section 609 of the LMRDA, 29 U.S.C. § 529.

---

**5.** In opposing Defendant's motion for summary judgment, Plaintiff challenged only the decision to impose the administratorship. Plaintiff therefore concedes the reappoint-

ment issue by not addressing it in his brief. Furthermore, if the administratorship was not improperly imposed, the reappointment issue is moot.

The relevant portion of Section 101(a)(2) of the LMRDA provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; ... *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligation.

29 U.S.C. § 411(a)(2). Union members may bring a civil action in federal district court under Section 102 of the LMRDA in order to secure these rights. 29 U.S.C. § 412.

■ In *Sheet Metal Workers' Int'l Ass'n v. Lynn,* the Supreme Court held that the protections of Section 101(a)(2) could extend to the retaliatory removal of an elected union officer from union office. 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989).[6] To establish a *prima facie* case under Section 101(a)(2), Plaintiff must establish that: (1) Plaintiff's conduct was an exercise of free speech protected under the LMRDA; (2) Plaintiff was subjected to an adverse action; and (3) the adverse action was "a direct result of [Plaintiff's] decision to express disagreement" with the union's leadership. *See Lynn,* 488 U.S. at 354, 109 S.Ct. 639 (discussing elements a plaintiff must allege in order to state a cause of action); *see also Black v. Ryder/P.I.E. Nationwide, Inc.,* 970 F.2d 1461, 1469–70 (6th Cir.1992).

■ The legislative history of Title I of the LMRDA, 29 U.S.C. §§ 411–415, indicates that it was intended to protect union members from oppressive leadership while preserving the union's right to adopt reasonable rules of governance. *See United Steelworkers of Am., AFL–CIO–CLC v. Sadlowski,* 457 U.S. 102, 108–10, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). The Supreme Court, however, further stated that because rights under the LMRDA are subject to "reasonable" rules, "we do not believe that § 101(a)(2) should be read as incorporating the entire body of First Amendment law, so that the scope of protections afforded by the statute coincides with the protections afforded by the Constitution." *Id.* at 109–11, 102 S.Ct. 2339. Shortly after Plaintiff assumed the position of president of Local 303, he attempted to address the Confederate flag controversy at Alcoa and continued to pursue the issue after employees of the USWA allegedly told Plaintiff to "leave the Confederate flag alone." (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 39.) Because Plaintiff expressed his views concerning the Confederate flag as an elected official of Local 303, Plaintiff's conduct was an exercise of free speech protected under the LMRDA. *See Lynn,* 488 U.S. at 355, 109 S.Ct. 639 (holding that discharging an elected officer is significantly different from discharging

---

**6.** In *Sheet Metal Workers' Int'l Ass'n v. Lynn,* the speech that gave rise to the removal of the elected union officer occurred after the administratorship was in place and the elected officer was removed *during* an administratorship. On the other hand, in the present case, Plaintiff contends that the administratorship was imposed as a result of his "protected" speech, and Plaintiff was removed when the administratorship was imposed. Although

there is a strong presumption of validity where an administratorship is instituted through proper procedural safeguards and where it has been in place no longer than eighteen months, 29 U.S.C. § 464(c), the court will assume for the purposes of this litigation that the retaliatory removal of an elected union officer through the imposition of an administratorship falls under the protection of Section 101(a)(2).

an appointed officer because it has a chilling effect on the free speech of union members). However, Section 101(a)(2) also acknowledges the right of a labor organization to prohibit conduct which would interfere with the union's performance of its contractual obligations.

■ Although Plaintiff was subjected to an adverse action in that he was removed from the office of president, Plaintiff failed to establish that the removal was a direct result of his views of the Confederate flag. On the other hand, the overwhelming evidence indicates that the USWA imposed the administratorship because Local 303 was not functioning due to Plaintiff's conflict with Local 303's executive board. When the administratorship was imposed, every executive board member was suspended from office, including three African–American board members, at least two of whom did not support the display of the Confederate flag. The suspended executive officers, with the exception of Plaintiff, supported the imposition of the administratorship because the conflict between Plaintiff and the executive board resulted in Local 303 not functioning. As a result of Plaintiff removing board members from their committee assignments, Local 303 was not handling grievances and safety in the plant had deteriorated. According to O.T. Love, Local 303 was not enforcing substantial elements of the bargaining contract. In fact, Plaintiff concedes that he had difficulty working with the executive board.

Plaintiff's allegation that Weber and Wilson, two USWA employees, told Plaintiff to "leave the Confederate flag alone" is insufficient to create a genuine issue of material fact. (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 39.) Although Wilson recommended that Local 303 be placed under administratorship, Plaintiff presented no evidence that Becker, the Anderson or Herron–Graves International Commission, or the International Appeal Panel (the primary decision makers concerning placing Local 303 under administratorship) placed Local 303 under administratorship because of Plaintiff's views on the Confederate flag. Plaintiff notes that, in a January 9, 2001, report, the Herron–Graves International Commission concluded that "[t]he Local Union leadership allowed disagreements on some issues to prevent the full scope of representation of the membership" and that "[r]egardless of the reasons for the turmoil, the administratorship was necessary to assure the performance of the [collective bargaining agreement and] to restore the democratic procedures as outlined in the Constitution." (Pl.'s Resp. to Summ. J. Mot. at Ex. 4, Comm'n Report at 3.) Plaintiff argues that the "turmoil" the Herron–Graves International Commission referred to was a result of Plaintiff's views concerning the Confederate flag.

Even assuming *arguendo* that the "turmoil" the Herron–Graves International Commission referred to was in part a result of Plaintiff's views of the Confederate flag, the International may "adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2). Thus, if Local 303 was not functioning in part because of racial turmoil caused by Plaintiff's views concerning the Confederate flag, the International was justified in placing Local 303 under administratorship because it could not carry out its contractual obligations. *See Sadlowski*, 457 U.S. at 111–12, n. 4, 102 S.Ct. 2339 (stating that the provision contained in Section 101(a)(2) should not be read narrowly and "[t]he critical question is whether a rule

that partially interferes with a protected interest is nevertheless reasonably related to the protection of the organization as an institution"). Regardless, the record overwhelmingly establishes that Plaintiff's irreconcilable conflict with the executive board resulted in the need for an administratorship.

■ Plaintiff also claims that Defendant violated his rights protected under Section 609 of the LMRDA, 29 U.S.C. § 529. Section 609 of the LMRDA states that "[i]t shall be unlawful for any labor organization ... to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." 29 U.S.C. § 529. Although "discipline" in Section 609 may encompass the removal of a union member from elected office for an exercise of free speech, *Bradford v. Textile Workers of Am., AFL–CIO*, 563 F.2d 1138, 1141–42 (4th Cir.1977), as discussed above, Plaintiff failed to proffer evidence that it is likely that Defendant imposed an administratorship and removed him from office in retaliation for his views on the Confederate flag. Thus, the court will grant Defendant's motion for summary judgment with respect to Plaintiff's claims under the LMRDA.

### B. *Title VII and Section 1981*

■ Plaintiff also contends that Defendant discriminated against him due to his race in violation of Title VII and Section 1981. The elements required to establish a *prima facie* case are the same under Title VII and Section 1981. *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir.1998)

(citing *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir.1985)).

Although Plaintiff presented insufficient direct evidence to raise a genuine issue of material fact, Plaintiff may proceed under the burden-shifting scheme of *McDonnell Douglas*.[7] *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999). Pursuant to the *McDonnell Douglas* analysis, the plaintiff has the initial burden of establishing a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff meets this initial burden, a presumption of discrimination arises, and the burden shifts to the defendant to produce, but not prove, a "legitimate, non-discriminatory reason" for its decision. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant meets its burden, the presumption of discrimination that arose from the *prima facie* case disappears, and the burden of proof is left with the plaintiff to show that the defendant acted with a discriminatory intent and that its proffered explanation was a pretext for discrimination. *Id.* at 252–53, 101 S.Ct. 1089. "[E]vidence of pretext, combined with the plaintiff's prima facie case, does not *compel* judgment for the plaintiff, because it is not enough to disbelieve the [defendant]; the fact finder must also believe the plaintiff's explanation of intentional discrimination." *Equal Employment Opportunity Comm'n v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

**7.** Although this case is not an employment discrimination case because Plaintiff was not an employee of the USWA, Title VII covers labor organizations in addition to employers. 42 U.S.C. § 2000e–2(c)(1) ("It shall be an unlawful employment practice for a labor organization to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin.").

■ In the present context, to establish a *prima facie* case of discriminatory removal from union office, Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse action; (3) at the time of the adverse action he was performing at a level that met his union's legitimate job expectations; and (4) the position remained open to or was filled by similarly qualified applicants outside the protected class. *See Brinkley*, 180 F.3d at 607.

■ Plaintiff has failed to establish a *prima facie* case. As an African–American, Plaintiff is a member of a protected class and Defendant acted adversely against Plaintiff (imposing an administratorship and removing Plaintiff). However, Plaintiff was not performing as Local 303 president in a manner that met the USWA's legitimate expectations because the local union was in disarray and not functioning. Furthermore, when Defendant imposed the administratorship, the entire Local 303 executive board, including Caucasian officers, was affected in the same manner as Plaintiff.[8] Thus, the challenged action affected all individuals regardless of race. Moreover, prior to Plaintiff taking office as president of Local 303, two of the three preceding presidents of Local 303 were African–American, and neither of these two African–American presidents were removed from office. Plaintiff conceded that he had no evidence that Wilson, Becker, or anyone on the International Appeal Panel discriminated against Plaintiff on the basis of race. (Def.'s Evidentiary Submission in Supp. of Mot. for Summ. J., Pl.'s Dep. at 245–46.) Plaintiff argues that Defendant used its powers to suppress dissent, but presents no evidence that Becker or anyone on the International Appeal Panel imposed the administratorship based on Plaintiff's race.

■ Even assuming *arguendo* that Plaintiff established a *prima facie* case, Plaintiff failed to rebut Defendant's legitimate, non-discriminatory reason for imposing the administratorship. As noted above, Defendant claims that Local 303 was placed under administratorship because Local 303 was not carrying out its contractual and representational obligations. Because Plaintiff presented no evidence to rebut Defendant's legitimate, non-discriminatory reason for placing Local 303 under administratorship and refusing to reappoint Plaintiff, the court will grant Defendant's motion for summary judgment with respect to Plaintiff's Title VII and Section 1981 claims.

## CONCLUSION

The LMRDA and court decisions construing it expressly recognize the right of a labor organization to adopt reasonable rules to assure that members and officers do not act in a way that interferes with the union's responsibility to enforce contractual provisions and to protect its members. 29 U.S.C. 411(a)(2). A local union is not fulfilling its obligations to its members when committees are not functioning and grievances are not being processed. In such circumstances, the parent union has the right to place the local under trusteeship to assure the performance of the collective bargaining agreement, and such trusteeship is presumed valid when instituted through proper procedural safeguards. 29 U.S.C. §§ 462, 464(c). It is undisputed that the reason that Local 303 was not functioning was because of actions taken by Plaintiff. Therefore, the Interna-

---

8. Although Weber appointed all the former executive board members, with the exception of Plaintiff, to acting positions, three of the executive board members appointed to assist Weber are African–American.

tional acted within the law when it placed Local 303 under administratorship. That administratorship has now been lifted and control has been returned to the local through open elections held in May 2002.

For the reasons set forth in this opinion, the court will grant Defendant's motion for summary judgment on all of the Plaintiff's claims.