# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-3573

———————

Ronald J. Hylla,

      Appellant,

    v.

Transportation Communications
International Union,

      Appellee.

    Appeal from the United States
District Court for the
District of Minnesota.

———————

Submitted: June 9, 2008
Filed: August 6, 2008

———————

Before LOKEN, Chief Judge, EBEL,[1] and COLLOTON, Circuit Judges.

———————

EBEL, Circuit Judge.

    Plaintiff-Appellant Ronald J. Hylla appeals from the district court's decision granting Defendant-Appellee Transportation Communications International Union's ("TCIU") motion to dismiss or, alternatively, for summary judgment. Hylla's appeal

———————

[1] The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation.

calls on us to consider the scope of protection offered to elected union officers under Title I of the Labor-Management Reporting and Disclosure Act ("LMRDA"). The district court[2] concluded that the protection offered by Title I only extends to expression or speech that is related to the general union membership as a whole. Because the district court found that Hylla's speech was not so related, it granted TCIU's motion to dismiss on the ground that it lacked subject matter jurisdiction. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

On November 30, 2006, Hylla filed a complaint in the United States District Court for the District of Minnesota asserting that TCIU had "removed [him] from his [elected] position of senior vice general chairman of System Board of Adjustment No. 46." According to Hylla, TCIU had done so because he "exercised his right to engage in free speech, to meet and assemble freely with other members, and to express his views relative to the business of [TCIU] and System Board of Adjustment No. 46...." Hylla asserted, *inter alia*, that TCIU's conduct was a violation of Title I of the LMRDA.

Hylla's complaint was terse. Aside from mentioning that TCIU had removed him from his position, it did not divulge the facts that gave rise to his claim. Instead, the case's relevant factual background was initially revealed in the memorandum of law in support of TCIU's motion to dismiss or, alternatively, for summary judgment. Hylla responded to this motion and provided his own version of the facts. As the district court noted, however, "[t]he parties do not dispute the basic underlying facts as summarized by the Magistrate Judge and set forth in the transcript of the internal union hearing." Those facts may be summarized as follows.

---

[2] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

TCIU is a labor union that represents employees in the railroad industry. It has a three-tiered governance structure, the second tier of which consists of intermediate bodies known as System Boards. In May of 2004, Hylla was elected Senior Vice General Chairman of System Board of Adjustment No. 46 ("System Board"). As Senior Vice Chairman of the System Board, Hylla reported directly to the System Board's General Chairman, Larry Swanson.

The events that precipitated this case occurred on November 14, 2005. It was on that day that Hylla left a note in Swanson's office inquiring why Swanson was monitoring his workplace attendance. In response, Swanson told Hylla that he had instructed Kelly Gilbertson, an administrative employee in the System Board office, to keep attendance records of "everybody" so that he could "know when people are in the office and when they're not." Hylla was skeptical of this explanation and complained that he was being singled out. Thereafter, the two exchanged some additional remarks, with Hylla eventually telling Swanson, "well, fuck you." Upset, Swanson replied that Hylla had "gone too far" and that this would not be the end of the matter. Swanson thereafter exited the office and went to the lunchroom to make a personal phone call.

When Swanson returned to the office, he observed that Gilbertson was standing in front of her office door visibly upset. Swanson asked Gilbertson what happened; Gilbertson responded that she had just been threatened by Hylla. According to Gilbertson, Hylla had walked into her office, thrown a stack of papers on her desk, and said "watch your back." Gilbertson interpreted Hylla's remark as a threat, especially in light of Hylla's unpleasant demeanor. Thereafter, Swanson confronted Hylla about Gilbertson's allegations, to which Hylla offered no response.

Troubled by Hylla's conduct, Swanson contacted Robert Scardelletti, the International President of TCIU, to discuss what had occurred. Pursuant to this discussion, on November 16, 2005, Swanson instructed Hylla that he was not to return to the System Board office until he was otherwise informed. Thereafter, in a letter

dated November 18, 2005, Scardelletti informed Hylla that he was being charged with conduct unbecoming of an officer, insubordination, and dereliction of duty, all in violation of TCIU's constitution. These charges arose from the two incidents that occurred on November 14, 2005, as well as previous incidents that occurred in August and December of 2004. Hylla was suspended pending a hearing on the charges.

Hylla's hearing occurred on January 19, 2006, and featured testimony from several witnesses, including Hylla, Swanson, and Gilbertson. Following the hearing, the TCIU hearing officer recommended that Hylla be found guilty of all but one of the charges against him. As a consequence, the hearing officer further recommended that Hylla be removed from office and declared permanently ineligible to hold any TCIU office in the future. Scardelletti adopted the hearing officer's recommendations and thereafter informed the District Chairpersons of his decision. Scardelletti made clear that his decision was based on the two incidents that occurred on November 15, 2005: (1) Hylla's use of profane language towards Swanson, and (2) Hylla's perceived threat towards Gilbertson.

Hylla appealed Scardelletti's decision to the TCIU Executive Counsel, which sustained the decision. Thereafter, having exhausted his intraunion remedies, Hylla brought suit in the district court, claiming, *inter alia*, that TCIU's decision to remove him from office violated his free speech rights under Title I of the LMRDA. After TCIU responded with a motion to dismiss or, alternatively, for summary judgment, the district court ruled in TCIU's favor. According to the court, because the conduct for which Hylla was removed from office was not protected by the LMRDA, it lacked subject matter jurisdiction over Hylla's action. Hylla now appeals.

## II. DISCUSSION

In granting TCIU's motion to dismiss for lack of subject matter jurisdiction, the district court concluded that Hylla's conduct "did not concern the general interests

of the union membership" and therefore was "not protected speech under Title I of the LMRDA." On appeal, Hylla contends that the district court's decision was erroneous because Title I protection is not strictly limited to speech relating to the general interests of the union membership. Alternatively, Hylla contends that even if Title I protection is so limited, his conduct was sufficiently related to the general interests of TCIU so as to fall within the scope of Title I's protections. Each of these arguments will be considered in turn.

## A. Standard of Review

"[W]hen the district court's decision to dismiss for lack of subject matter jurisdiction is based on the complaint alone, or on the complaint supplemented by undisputed facts evidenced in the record," our review is "'limited to determining whether the district court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed.'" Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). "If the court relied, however, on its own determination of disputed factual issues, the appellate court must then review those findings under the 'clearly erroneous' standard." Id.

In this case, the district court did not resolve any factual disputes in determining that it lacked subject matter jurisdiction. Although Hylla argued that profane language was common at the System Board, this contention had no bearing on whether his remark to Swanson was protected by the LMRDA, and therefore, was not relevant in determining whether subject matter jurisdiction existed. Similarly, although Hylla believed that his conduct towards Gilbertson was non-threatening, this too had no bearing on whether the conduct was protected by Title I of the LMRDA, and in turn, had no bearing on whether the district court had subject matter jurisdiction over Hylla's action. Thus, because no material factual issues were decided, the district court's decision is reviewed de novo.

## B. The LMRDA

Hylla's claims arise under § 101(a)(2) of the LMRDA. This section, titled "Freedom of Speech and Assembly," provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

Section 102, in turn, provides a private right of action for violations of § 101(a)(2). Section 102 reads in relevant part: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412.

## 1.  The Scope of § 101(a)(2) Protection

Although on its face § 101(a)(2) claims are limited to union <u>members</u>, the Supreme Court has recognized that in some instances union members who hold elected office – like Hylla – may pursue claims pertaining to their status as an officer under § 101(a)(2).  <u>Sheet Metal Workers' Int'l Ass'n  v. Lynn,</u> 488 U.S. 347, 354-55 (1989).  Specifically, the Court has reasoned that "[w]hether ... interference with Title I rights gives rise to a cause of action under § 102 must be judged by reference to the LMRDA's basic objective: to ensure that unions are democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections."  <u>Id.</u> at 354 (quotation, alteration omitted).  In <u>Lynn</u>, this basic objective cut in favor of recognizing a cause of action, because

> [s]eeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal, other members of the [union] may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what Congress sought to prevent when it passed the LMRDA.  It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal.

<u>Id.</u> at 355 (footnote, quotation omitted).

The Court also observed that Lynn himself, who was also a union member, "paid a price for the exercise of his membership rights" when he was discharged from his elected position as a business representative of the union in retaliation for his outspoken speech against a dues increase.  <u>Id.</u> at 354.  Both the rights of other union members to elect Lynn as their business representative and Lynn's free speech rights as a union member to campaign against the dues increase were chilled by the decision of the union president to discharge Lynn.  The Court considered both sets of rights in

the balancing analysis to determine whether Lynn's discharge was so undemocratic as to violate Lynn's § 101(a)(2) rights. The circumstances in <u>Lynn</u> may be contrasted with <u>Finnegan v. Leu</u>, 456 U.S. 431 (1982), where there was no countervailing democratic interest to weigh against the decision of a newly elected union officer to replace previously <u>appointed</u> union officials with his own staff. In <u>Lynn</u>, however, the Court determined that on balance, § 101(a)(2) was violated when Lynn was discharged.

Here, Hylla was an elected official, suggesting some similarity to <u>Lynn</u>. But, Hylla's discharge was not as a result of his representing the democratic will of the union membership. Rather, it was the result of his speech and conduct in protest of what he perceived to be a personal affront against him. We must therefore decide whether Hylla's discharge under such circumstances chilled or threatened any union democratic values protected by § 101(a)(2).

In analyzing this question, we draw some guidance by analogy from the Supreme Court's observation that § 101(a)(2) "was patterned after the First Amendment." <u>Reed v. United Transp. Union</u>, 488 U.S. 319, 326 (1989).[3] However, as the Court observed, the rights under § 101(a)(2) are subject to reasonable union rules that may restrict such rights, and thus, § 101(a)(2) is not strictly parallel with the

---

[3] In drawing on this analogy, we are by no means suggesting that § 101(a)(2) of the LMRDA is perfectly coextensive with the First Amendment. For instance, although in <u>Finnegan</u> the Court made clear that an <u>appointed</u> union representative could not pursue a claim under § 101(a)(2), similar limitations do not always apply in the First Amendment context. <u>See, e.g.</u>, <u>Langley v. Hot Spring County</u>, 393 F.3d 814, 817 (8th Cir. 2005) (applying the holding in <u>Branti v. Finkel</u>, 445 U.S. 507 (1980), that because "political patronage dismissals impinge upon public employees' First Amendment rights of speech and association ... a dismissal solely on account of an employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved" (quotation omitted)).

First Amendment even though § 101(a)(2) was patterned after it. United Steelworkers v. Sadlowski, 457 U.S. 102, 111 (1982) (asserting "Congress modeled Title I [of the LMRDA] after the Bill of Rights, and ... the legislators intended § 101(a)(2) to restate a principal First Amendment value – the right to speak one's mind without fear of reprisal").

In the First Amendment context, when deciding whether a public employee's speech is protected, "[t]he threshold question ... is whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern...'" Wingate v. Gage County Sch. Dist., No. 34, ___ F.3d ___, 2008 WL 2404553, *4 (8th Cir. June 16, 2008) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147. However, "when a government employee speaks 'as a citizen' – that is, outside the scope of employment – on 'matters of public concern,' the First Amendment offers protection if the speech survives the Pickering balancing test...." McGee v. Pub. Water Supply, Dist. # 2, 471 F.3d 918, 920 (8th Cir. 2006) (referring to Pickering v. Bd. of Educ., 391 U.S. 563 (1968)).

Similar criteria must be applied in the LMRDA context as well. Namely, instead of the First Amendment inquiry that asks "whether the employee spoke as a citizen on a matter of public concern," the threshold inquiry in the LMRDA context is whether the speech at issue "may be fairly characterized as a matter of union concern." And like in the First Amendment context, speech that involves entirely

personal interests is not, absent the most unusual circumstances, a matter of <u>union</u> concern. <u>See, e.g., Maceira v. Pagan</u>, 649 F.2d 8, 14 (1st Cir. 1981) (asserting, "[i]n drawing the 'fine line' between insubordination and freedom of speech in 'removal from union position' cases, we must balance plaintiffs' interest in free speech and expression against whatever legitimate union concerns may warrant limitations upon those activities" (citation omitted)).

As such, we agree with the district court that § 101(a)(2) protection is limited to speech that relates to the general interests of the union membership at large. In addition to § 101(a)(2)'s relation to the First Amendment, our disposition of this issue is bolstered by the Supreme Court's observation in <u>Lynn</u> that Title I of the LMRDA was founded on Congress' desire to protect the democratic governance of unions. Because a union's democratic governance will not be undermined by speech that is entirely personal, it is appropriate that no cause of action would arise for such expression. Thus, as this court has previously recognized, § 101(a)(2) protects "labor organization members' reasonable rights of assembly and speech <u>relating to their labor organization</u>...." <u>Marshall v. Local Union No. 6, Brewers & Maltsters and Gen. Labor Dep'ts</u>, 960 F.2d 1360, 1365-66 (8th Cir. 1992) (emphasis added). It does not, however, go beyond what would be provided for under the First Amendment, to protect speech that is of an entirely personal interest.

In arguing that § 101 (a)(2) protection is not so limited, Hylla chiefly relies on <u>Salzhandler v. Caputo</u>, 316 F.2d 445 (2d Cir. 1963). <u>Salzhandler</u> involved a case in which the plaintiff, who was an elected financial secretary of a union, accused union officers of embezzlement and distributed a flier to the union membership describing the officers as "thieves, scabs, robbers, scabby bosses, bums, pimps, f-bums, (and) jailbirds." <u>Id.</u> at 447. In response to this conduct, which the union leadership contended was libelous, the plaintiff was removed from his position and prohibited from participating in the affairs of the union for five years. The plaintiff

sued, asserting that his conduct was protected under Title I of the LMRDA. The Second Circuit agreed. Id. at 449-51.

To the extent that Hylla argues that Salzhandler stands for the notion that § 101(a)(2) protects speech that is not a matter of union concern, he is mistaken. The speech in Salzhandler was clearly related to the general interests of the union. Namely, it involved allegations that union funds were being misappropriated, a matter about which the general union membership would no doubt have an interest.

Hylla's reliance on Turner v. Air Transport Lodge 1894 of International Association of Machinists and Aerospace Workers, 590 F.2d 409 (2d Cir. 1978), Stachan v. Weber, 535 F.2d 1202 (9th Cir. 1976), and Williams v. United Steel Workers of America, 234 F. Supp. 2d 542 (M.D.N.C. 2002), is similarly misplaced. The conduct that gave rise to the § 101(a)(2) claims in each of these cases did not involve matters of an entirely personal nature, but instead, concerned matters that implicated the interests of the union as a whole. Specifically, Turner involved the espousal of communist ideas during a campaign for union office in violation of an express union constitutional provision that made it misconduct by a member to advocate communism or any other totalitarian philosophy. Stachan, meanwhile, involved speech concerning a general union policy that required a flag salute and the recitation of the pledge of allegiance during each union meeting. Finally, Williams involved speech about the Confederate flag by a local union leader when there was in fact a general Confederate flag controversy swirling about the plaintiff's workplace and that had led to turmoil in the union's governance. Although the court in Williams held that the speech was protected by § 101(a)(2), it was so disruptive to the functioning of the union that it was properly regulated under the proviso allowing unions to establish "reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligation."

-11-

## 2. Hylla's Conduct

Having determined that § 101(a)(2) is limited to speech concerning matters of union concern, we must next determine whether Hylla's conduct was so related. In the First Amendment context, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. As this court has observed in McGee, "when a government employee speaks 'as an employee upon matters only of personal interest,' such as many personnel matters, the First Amendment does not offer protection. Connick, 461 U.S. at 147, 103 S. Ct. 1684. On the other hand, when a government employee speaks 'as a citizen' – that is, outside the scope of employment – on 'matters of public concern,' the First Amendment offers protection if the speech survives the Pickering balancing test...." 471 F.3d at 920. In Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), the Supreme Court further clarified Connick by holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Applying these notions to the LMRDA context, it is clear that when a union member or elected officer speaks out about matters that relate solely to that individual's interest, § 101(a)(2) protection does not arise.[4]

In this case, there were two incidents for which Hylla was allegedly disciplined: (1) his use of profanity towards Swanson, and (2) his alleged threat towards Gilbertson. We conclude that Hylla's conduct in neither instance involved a matter of union concern, but instead was solely focused on Hylla's personal interests.

---

[4] "The inquiry into the protected status of speech is one of law, not fact." Connick, 461 U.S. at 148 n.7.

When Hylla remarked "well, fuck you" to Swanson, he was agitated that he was being "singled out" by Swanson's decision to record workplace attendance. Thus, almost by its very terms, Hylla's remark did not relate to the general interests of the union membership, but rather related to a concern about his unique situation. This is not the type of speech that § 101(a)(2) was designed to protect. Hylla's remark had little connection to any general union interest and instead may be more readily understood as individual insubordination. At best, the speech was directed at a particular administrative policy – that according to Hylla's own pleadings was adopted in order to single out a particular officer – rather than anything concerning the governance of the union generally.

Hylla's conduct towards Gilbertson was of a similarly personal nature. Even if it is assumed, as Hylla argues, that his conduct was non-threatening, the conduct did not implicate the general interests of the union. Gilbertson was a clerical employee who had no control over the attendance policy and was acting at the direction of Swanson. Under such circumstances, no matter of general union interest was involved in Hylla's confrontation with Gilbertson.

Nevertheless, in arguing that his conduct did implicate the general interests of the union, Hylla contends that "[n]ot only was [he] complaining about being singled out, he was complaining that Swanson, [Tom] Truhler and Gilbertson and the office as a whole were not keeping accurate track of his time." (Emphasis added.) By its very terms, however, this argument demonstrates the personal nature of Hylla's conduct. Hylla's remarks did not relate to anything that involved the interests of the union generally, but instead were personal grievances about the way he was being treated. Just as such speech would not be protected in the First Amendment context, Congress did not intend for such speech to be protected under Title I of the LMRDA.

Hylla, however, counters that because the System Board's policies impacted his performance as an elected union officer, the general interests of the union

-13-

membership were implicated when he complained about these policies directed against him. Although in a very remote sense "this may be true, it does not serve to convert [Hylla's] personal grievances into a matter of [union] concern." Crain v. Bd. of Police Comm'rs of Metro. Police Dep't of St. Louis, 920 F.2d 1402, 1411 (8th Cir. 1990). As this court observed in Crain, where it was argued that what were purely personal grievances were a matter of public concern because they impacted the griever's family, "[a]ny management decision, e.g., the size of a salary increase or the number of company holidays, affects the employees and their families; this is decidedly not the proper test for determining what speech implicates a matter of public concern." Id. Similarly, any nuance in Hylla's working conditions, whether it be his parking space or office temperature, could potentially affect his performance as an elected union officer. To say that such concerns implicate the general interests of the union, however, would swallow the rule. In every case, if we were to go down the rabbit's hole far enough, it would be hyperbolized that the general interests of the union – or for that matter the public – would be implicated. As such, we reject Hylla's argument.

To better illustrate why Hylla's argument fails, it is helpful to juxtapose Hylla's conduct with that which the Court found to create a cause of action under § 102 in Lynn. In Lynn, an elected union officer spoke in opposition to a proposed dues increase pursued by other members of the union leadership. 488 U.S. at 349-50. After the proposed dues increase was defeated by a vote of the union membership, the elected officer was notified "that he was being removed 'indefinitely' from his [elected] position ... specifically because of his outspoken opposition to the dues increase." Id. at 350. Because the elected officer's dismissal was specifically predicated upon his outspokenness regarding a matter of union governance, it was clear that his § 101(a)(2) rights had been violated and that a chilling effect may arise that would harm the union's democratic governance. Clearly in contrast to Lynn, the concerns raised by Hylla do not beget any such issues.

At the core, Hylla was removed because of his individualized insubordination. There was no union interest in allowing Hylla to conduct himself as he did. His dispute is purely personal in nature. It does not implicate union interests nor did his termination threaten to chill TCIU's democratic governance. As such, Hylla's claim that he was terminated for such conduct is not protected under § 101(a)(2) and therefore the courts lack jurisdiction of the claims under § 102 of the LMRDA.

## C. PRETEXT

As a final matter, Hylla contends on appeal that the district court erred by not considering whether TCIU's reasons for terminating him were pretextual. In this regard, Hylla alleges in his brief that TCIU removed him from his position not because of his conduct on November 14, 2005, but rather because he "had policy and philosophical clashes with Swanson over how best to represent the membership, how to handle cases where a railroad had disciplined or fired a member, and other issues." Although a § 101(a)(2) action may arise if a dismissal were "part of a purposeful and deliberate attempt ... to suppress dissent within [a] union," Lynn, 488 U.S. at 355 n.7 (quotations omitted), Hylla did not sufficiently raise this argument below.

In Hylla's complaint, he merely alleged that he was removed from his elected office "because [he] exercised his right to engage in free speech, to meet and assemble freely with other members, and to express his views relative to the business of" TCIU. The general allegations in Hylla's complaint cannot be said to raise an issue of pretext and pretext is never alleged. In any case, after Hylla's complaint was filed, TCIU, in its motion to dismiss or, alternatively, for summary judgment, supplied the facts that it believed to underlie Hylla's claim. In this regard, TCIU asserted that Hylla was terminated because of (1) his remark towards Swanson, and (2) his conduct towards Gilbertson. Although Hylla's response disputed that he was terminated for his conduct towards Gilbertson, Hylla himself asserted that "the real reason [he] was initially suspended and removed from office was because the heated content of his

-15-

conversation with ... Swanson and [his] use of the f*** word." (Emphasis added.) Similarly, a heading in Hylla's response read:

**PLAINTIFF WAS SUSPENDED AND REMOVED FROM ELECTIVE OFFICE BECAUSE HE EXERCISED HIS RIGHT TO FREE SPEECH IN A HEATED DISCUSSION ABOUT UNION POLICIES WITH GENERAL CHAIRMAN SWANSON AND NOT BECAUSE OF A MATTER OF "PURELY PERSONAL INTEREST".**

Incongruously, under this heading Hylla inserts a single paragraph that argues "it could very well be concluded that what took place on the day in question was a pretext to remove him for internal union political reasons." This statement is too abbreviated and equivocal to properly raise before the district court or to preserve for appeal an argument based on pretext. This is particularly so given Hylla's unequivocal and prominent statements that the real reason he was fired was because of his remarks to Swanson – precisely one of the reasons advanced by TCIU for his firing.[5]

Not surprisingly, given the lack of any such claim in Hylla's complaint, the lack of a pretext argument offered in Hylla's response, and Hylla's affirmative statement that he was fired for one of the precise reasons articulated by TCIU, the Magistrate, to whom the district court referred the matter for a recommended disposition, did not consider any claim of pretext in his report and recommendation.

It was only thereafter, in objecting to the Magistrate's report and recommendation, that Hylla developed his pretext argument, asserting in part that his

---

[5] The only other mention of the term "pretext" in Hylla's response was in relation to his state law defamation claims.

theory of this case is that he was removed and then banished from office for his lifetime not because of his use of a profanity toward Swanson or because of the incident with Gilbertson, but because of internal union policy and political considerations.

It was too late, however, for Hylla to offer this new, contradictory theory. In Roberts v. Apfel, 222 F.3d 466, 470 (8th Cir. 2000), this court considered "whether a claimant may make arguments in his objections to a magistrate judge's report when those arguments have been neither argued to the magistrate judge nor addressed in the judge's report adopted by the district court, and then obtain review of them on appeal." In answering this question negatively, the court asserted that "[t]he purpose of referring cases to a magistrate for recommended disposition [is] contravened if parties [are] allowed to present only selected issues to the magistrate, reserving their full panoply of contentions for the trial court." Id. (quotation omitted). A contrary rule "would allow a claimant to raise new claims to the district court and thus effectively have two opportunities for judicial review." Id. As such, because Hylla did not adequately present his pretext claims to the Magistrate, and the Magistrate's "report adopted by the district court" did not consider those claims, the district court did not err in failing to exhaustively consider those claims, and we decline to consider them on appeal. Id.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.