RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JONATHAN BARGER,

*Plaintiff-Appellant*,

*v.*

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA; INDIANA/KENTUCKY/OHIO REGIONAL
COUNCIL OF CARPENTERS; LOCAL UNION 2, UNITED
BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA,

*Defendants-Appellees*.

⟩ No. 19-3852

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:17-cv-00077—Susan J. Dlott, District Judge.

Argued: June 16, 2020

Decided and Filed: June 25, 2021

Before: BATCHELDER, BUSH, and LARSEN, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Stephen E. Imm, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellant.
Brian F. Quinn, DECARLO & SHANLEY, P.C., Washington, D.C., for Appellee United
Brotherhood of Carpenters and Joiners. Paul T. Berkowitz, PAUL T. BERKOWITZ
& ASSOCIATES, LTD., Chicago, Illinois, for Appellees Indiana/Kentucky/Ohio Regional
Council of Carpenters and Local Union 2, United Brotherhood of Carpenters and Joiners of
America. **ON BRIEF:** Stephen E. Imm, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for
Appellant. Brian F. Quinn, DECARLO & SHANLEY, P.C., Washington, D.C., Kristin Seifert
Watson, CLOPPERT, LATANICK, SAUTER & WASHBURN, Columbus, Ohio, for Appellee
United Brotherhood of Carpenters and Joiners. Paul T. Berkowitz, PAUL T. BERKOWITZ
& ASSOCIATES, LTD., Chicago, Illinois, Catherine Harshman, HUNTER CARNAHAN

SHOUB BYARD & HARSHMAN, Columbus, Ohio, for Appellees Indiana/Kentucky/Ohio Regional Council of Carpenters and Local Union 2, United Brotherhood of Carpenters and Joiners of America.

-------------------

**OPINION**

-------------------

ALICE M. BATCHELDER, Circuit Judge.  At least in part out of self-interest, Jonathan Barger, a union member, accused other union members of overbilling a client.  Barger's union prosecuted him under the union's constitution, so Barger filed suit against the United Brotherhood of Carpenters and Joiners of America ("UBC"), Indiana/Kentucky/Ohio Regional Council of Carpenters ("IKORCC"), and UBC Local Union 2 ("Local 2") under the Labor-Management Reporting and Disclosure Act ("LMRDA"), alleging that his speech was protected.  The district court granted the unions' motions for summary judgment.  The question before us today is whether Barger's speech was protected as a matter of "union concern."  We find that Barger's speech was protected, and REVERSE in part, AFFIRM in part, VACATE in part, and REMAND for proceedings consistent with this opinion.

**I.  Background**

Local 2 is a local labor organization headquartered in Monroe, Ohio, and represents carpenters and workers in related industries in Southwest OhioLocal 2 is a local affiliate of Defendant IKORCC, which represents carpenters and workers in related industries in Indiana, Kentucky, and Ohio.  The IKORCC is an affiliated regional union of Defendant UBC, which represents carpenters and workers in related industries in the United States and Canada.

Jonathan Barger has been a member of Local 2 since 1999.  From 2007 to 2015, he worked intermittently as a carpenter for Solid Platforms, Inc. ("SPI"), a construction company that employs IKORCC union members and is, by association, a signatory of the IKORCC's Southwest Ohio Carpenters Agreement (the "Southwest Ohio CBA").[1]  One of SPI's clients, Dynegy, Inc., owned and operated the Zimmer Power Station.  Barger worked at Zimmer Power

-------------------

[1]Neither the UBC nor Local 2 is a signatory to the Southwest Ohio CBA.

Station between 2014 and 2015, reporting to three SPI supervisors—General Foreman Art Galea, Project Manager Kipp Kahlenbeck, and Safety Manager/Area Manager Daniel Jason Hall (all of whom were union members)—until SPI laid him (and some other employees) off on October 25, 2015.

Two days later, Barger called Dynegy's Zimmer Power Station Maintenance Manager, Joe Lind, asking for a job. When Lind rejected Barger's request, Barger responded that he could "pay [his] own way" because "[SPI is] stealing money from you" by falsifying hours. R. 97, Page ID #912. In other words, Barger believed that Dynegy could pay for his employment with the money it would save from his revealing SPI's falsifying hours. Lind, apparently acting on his own accord, banned Barger from Zimmer Power Station one day later (apparently without telling Barger). Lind claims that the ban was unrelated to the allegation of overbilling. R. 103-1, Page ID #1837.

The same day, October 27th, Barger called Dave Meier, an IKORCC business agent and member of Local 2, to complain that he had not received his last paycheck. Barger also told Meier that he had called Lind and told him that SPI's three supervisors were overbilling Dynegy. Meier reached out to one of the SPI supervisors, Galea, to ask about Barger's paycheck.

Meier and Barger continued to speak by phone every day until October 30th. Apparently unbeknownst to Barger, Meier had Jeff Gressler, a senior services representative, listen in on one of their phone conversations. Meier wanted to have a witness to Barger's complaints because Meier was considering bringing a charge against Barger. Meier asked Barger whether it was true that he had told Lind that SPI was overbilling Dynegy; Barger confirmed that he had. Meier then asked whether Barger "was aware of [the] potential consequences to brother and sister members," and Barger said that he was and that it was worth it "to get even with" the SPI supervisors because he was "sick of their shit." During another conversation, Barger told Meier that "if that's the kind of guys that you want in your union then, you know, I don't want to be a part of it," and stated that he would be taking a nonunion job.

On October 30th, Meier filed a charge with the IKORCC against Barger for violating two sections of the UBC Constitution: § 51(A)(1), "Causing Dissension," and § 51(A)(12), failing to

use "every honorable means to procure employment for Brother and Sister Members." In his deposition, Meier testified that he had decided to bring these charges because Barger continued to press the billing issues with him, and that he might not have brought the charges had Barger told only Lind or mentioned it to him only once. The IKORCC trial committee held a trial on May 11, 2016,[2] and recommended a verdict upholding the charge and fining Barger $5,000. The IKORCC adopted the trial committee's recommendations, and Barger appealed to the UBC.

On August 8, 2016, Barger filed a third grievance with the UBC, alleging that the IKORCC failed to provide a receipt for his appeal payment, and seeking receipt of his $50 appeal deposit and a time extension to prepare his appeal to the UBC. By August 11th, Barger's receipt apparently had been delivered to him, so the point was moot; the UBC also denied Barger's request for a time extension.

On August 22nd, Barger tried to appeal the IKORCC's decision, but, on September 8th, the UBC rejected the appeal because Barger failed to include a receipt for his payment of his $50 appeal fee (the same receipt he had just received on August 10th). On September 22nd,[3] Barger perfected his appeal. On October 4th, the UBC requested that the IKORCC answer within thirty days. On November 17th, Barger filed a grievance due to IKORCC's delay in responding. The IKORCC filed its answer on November 21st (18 days late). On May 16, 2017, the UBC granted Barger's appeal, reversed the guilty verdict, vacated the $5,000 fine imposed, and ordered that his $50 appeal fee be returned.

On November 12, 2015 (about two weeks after Meier initially brought a charge with the IKORCC against Barger), Environmental and Safety Solutions, Inc. ("ESS"), which provides safety supervision services on construction sites, hired Barger as an independent contractor. ESS assigned Barger to work at the Zimmer Power Station the Saturday before Thanksgiving in 2015. But when he arrived on site, he was denied entry. At this point, Barger had not told anyone at

---

[2]Barger filed a grievance on May 11, 2016, claiming that the IKORCC was violating the LMRDA, but the UBC rejected it on May 16th as untimely because it was filed more than 30 days after the date the alleged violation occurred. Barger filed a second grievance, also on May 11th, alleging that Meier was not referring work to him, but the UBC denied that grievance on the merits.

[3]Barger's appeal was erroneously dated August 22, 2016.

Dynegy that he was now working for ESS. Barger then performed more services for ESS at different work sites until the Wednesday before Thanksgiving, but this was his last assignment, because after that, ESS, without notice to Barger, stopped offering him assignments. Barger sent a text message in April 2017 to an ESS representative, but does not recall whether he contacted ESS at any other point to request more work assignments.

Since January 2016, Barger has worked multiple jobs for several different employers. From January 2016 until January 2018, Barger placed his name on IKORCC's "Mix 20/20" automated job referral system, which calls members based on the member's skills and the jobs the member is willing to accept, as entered into the system. Barger accepted a job he had received through this referral system in January 2018. Prior to that, he had been called by the system 195 times with job referrals.

Barger filed suit on February 3, 2017. Following a series of motions that reduced the number of claims and defendants, the remaining claims were (1) that Local 2, IKORCC, and UBC violated Barger's free speech rights under § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2); (2) that, in violation of the LMRDA, the IKORCC and the UBC conspired to retaliate against Barger for exercising his free speech rights; and (3) that Dynegy committed tortious interference with Barger's employment relationship with ESS. On March 25, 2019, the four remaining defendants (*i.e.*, Local 2, the IKORCC, the UBC, and Dynegy) each filed a motion for summary judgment. The district court granted all four motions on August 6, 2019. Barger now timely brings three claims on appeal. He argues that Local 2, the IKORCC, and the UBC violated his free speech rights under § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2); that they committed a per se violation of the LMRDA when they retaliated against him for "slandering" a union official; and that they conspired to violate the LMRDA under Ohio law.

## II. Analysis

"A district court's grant of summary judgment is reviewed de novo." *Andrews v. Wayne County*, 957 F.3d 714, 721 (6th Cir. 2020) (citation omitted). "Summary judgment is proper 'if there is no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "The standard of review in a mixed

question of law and fact generally depends on 'whether answering it entails primarily legal or factual work.'" *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 433 (6th Cir. 2019) (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)). "We review a district court's statutory interpretation de novo." *Id*. "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). We therefore review de novo the district court's conclusions regarding whether Barger's speech was protected under the LMRDA.

## A.  Claim I:  Whether Barger's Speech was a Matter of Union Concern

### 1.  Section 101(a)(2)

Barger claims that his speech was protected under § 101(a)(2) of the LMRDA. Before we review the language of § 101(a)(2), it is useful to note the history and context in which the LMRDA was first passed in the late 1950s:

> The Labor–Management Reporting and Disclosure Act grew out of the McClellan Committee's investigations of autocracy and corruption in the labor movement in the late 1950s. The Congressional committee uncovered many ways in which corrupt leaders had dominated unions and remained unaccountable to their members. Congress passed Title I of the LMRDA in order to ensure truly democratic unions, in which policies were formulated and adopted after open debate and criticism. The legislation was also intended to make previously-insulated union leaders accountable to the membership. The pervading premise is that there should be full and active participation of the rank and file in the affairs of the union. Title I of the Act therefore establishes a "Bill of Rights" that ensures, for example, a union member's right of free speech and right to sue or otherwise participate in legal proceedings against the union. A union official may not be dismissed for exercising these rights.

*Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1466 (6th Cir. 1992) (internal quotation marks, editorial marks, and citations omitted). Barger's first claim rests on the meaning of § 101(a)(2), and the "starting point for any question of statutory interpretation is the language of the statute itself." *United States v. Coss*, 677 F.3d 278, 283 (6th Cir. 2012) (internal quotation

marks and citation omitted). The LMRDA's freedom-of-speech clause, § 101(a)(2),[4] 29 U.S.C. § 411(a)(2), states in full:

**(2) Freedom of speech and assembly**

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

This statute contains three clauses: freedom of assembly; freedom "to express any views, arguments, or opinions"; and freedom to express at meetings views upon election candidates and issues. *Id.* All three clauses are subject to the proviso that allows unions "to adopt and enforce reasonable rules." *Id.* This proviso functions as an affirmative defense in that the union defendant bears the burden of proving that a restriction meets the proviso. *Thompson v. Office & Prof'l Emps. Int'l Union*, 74 F.3d 1492, 1507 (6th Cir. 1996). Barger's free-speech claim, unlinked to any union meeting or election, sounds only in the second of these clauses. In order to establish a *prima facie* case, a plaintiff bringing a § 101(a)(2) claim must prove that (1) his conduct was protected by the LMRDA; (2) the defendant took actions against him in substantial part because of this exercise of his rights under the LMRDA; and (3) he was damaged and suffered an injury, as a proximate result of the actions of the defendant. *Black*, 970 F.2d at 1469.

## 2. Legal Test

Relying on out-of-circuit LMRDA cases, and an in-circuit case on a similar issue, the district court held that the "threshold question [is] whether [Barger]'s speech touched on a matter

---

[4]Section 102 of the LMRDA, 29 U.S.C. § 412, provides:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

of union concern." *Barger v. United Bhd. of Carpenters & Joiners*, 398 F. Supp. 3d 245, 253–54 (S.D. Ohio 2019) (citing *Kazolias v. IBEW LU 363*, 806 F.3d 45, 51 (2d Cir. 2015); *Trail v. Local 2850 UAW United Def. Workers*, 710 F.3d 541, 546 (4th Cir. 2013); *Hylla v. Transp. Commc'ns Int'l Union*, 536 F.3d 911, 917 (8th Cir. 2008); *Bonnell v. Lorenzo*, 241 F.3d 800, 809–10 (6th Cir. 2001)).  To determine whether the speech was of union concern, the district court said that it must look to "the content, form, and context of the speech at issue." *Id*. at 253–55.  The district court held that Barger's speech was not a "matter of union concern," and thus was not protected under the LMRDA. *Id*. at 255–56.

The district court overlooked or elided a relevant case from our circuit, *United Food & Commercial Workers Int'l Union Local 911 v. United Food & Commercial Workers Int'l Union*, 301 F.3d 468, 474–75 (6th Cir. 2002) ("*Local 911*"), in which we held that the protections of § 101(a)(2) apply to assembly and speech that "implicate union democracy." *Local 911*, 301 F.3d at 475.  We looked to the Supreme Court's decision in *United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102 (1982), for guidance on what implicates union democracy:

> Congress adopted the freedom of speech and assembly provision in order to promote union democracy.  It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal.

*Sadlowski*, 457 U.S. at 112 (internal citations omitted); *Local 911*, 301 F.3d at 474.  So *Local 911* cabins § 101(a)(2)'s free speech right to speech that implicates union democracy, *including* speech related to union policies and criticism of union leadership.  Notably, *Local 911* does not establish a test for determining when speech does or does not meet this standard.

Nor has this circuit decided the proper legal test for § 101(a)(2) free speech claims.[5]  The Supreme Court instructs that "First Amendment principles may be helpful, although they are not controlling." *Sadlowski*, 457 U.S. at 111.  This circuit's caselaw on the second LMRDA § 101(a)(2) clause establishes a tight nexus between LMRDA claims and First Amendment

---

[5]We addressed a § 101(a)(2) free-speech claim in *Black*, but it was in the context of addressing whether a union could violate a member's LMRDA free-speech rights under § 101(a)(2) when it provided due process under § 101(a)(5).  970 F.2d at 1467–69.  The speech at issue in that case, picketing, clearly was protected by § 101(a)(2) (and the parties did not contest the issue), so we did not discuss the proper test to determine whether the speech was protected.

principles and tests. *See Shimman v. Miller*, 995 F.2d 651, 653 (6th Cir. 1993) (interpreting *Sadlowski* as saying "a court's inquiry under § [101(a)(2)] is guided by First Amendment free speech principles"); *Knox Cnty. Local, Nat'l Rural Letter Carriers' Ass'n v. Nat'l Rural Letter Carriers' Ass'n*, 720 F.2d 936, 941 (6th Cir. 1984) (using "[p]revailing First Amendment principles" to analyze an LMRDA claim). Although both *Shimman* and *Knox County Local* deal with content-based restrictions on publication, we believe the strong adherence to First Amendment law applies to this context as well.

On appeal, Barger argues that the district court "erred when it applied a form-content-context inquiry instead of a *Pickering* balancing test in analyzing whether [Barger]'s speech was 'a matter of union concern.'" *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (establishing a balancing test between the individual's interest in free speech and the school board's interest in restricting the speech). Local 2 and the IKORCC argue that (1) Barger failed to argue before the district court that *Pickering* applied, and thus forfeits the issue, and (2) the district court applied the correct legal test with the form-content-context inquiry. The UBC "adopts the arguments raised by IKORCC and Local Union 2 in their opposition to the Appeal regarding this issue." We begin by considering each test's role in free speech and LMRDA claims.

### a. The form-content-context test

The form-content-context test is used to determine whether challenged speech is a "matter of public concern" in First Amendment cases and has been used by other circuits to determine whether speech is a "matter of union concern" in LMRDA cases. *Compare Bonnell*, 241 F.3d at 812 ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (quoting *Connick*, 461 U.S. at 147–48)), *with Hylla*, 536 F.3d at 917 ("[T]he threshold inquiry in the LMRDA context is whether the speech at issue may be fairly characterized as a matter of *union* concern." (internal quotation marks omitted)), *and Trail*, 710 F.3d at 546–47 (adopting the same form-content-context test to determine whether speech is a matter of union concern (citing *Hylla*, 536 F.3d at 917–18)).

First Amendment doctrine requires courts to identify "matters of public concern" because "free and open debate" on such matters is "vital to informed decision-making by the electorate"—that is, vital to our democracy. *Pickering*, 391 U.S. at 571–72. Similarly, identifying "matters of union concern" enables courts to identify issues that "implicate union democracy." *See Hylla*, 536 F.3d at 916–17 (determining whether speech implicated "any union democratic values" by asking "whether the speech at issue 'may be fairly characterized as a matter of union concern'" (emphasis omitted)); *Trail*, 710 F.3d at 546 (holding that determining whether "the speech at issue may be fairly characterized as a matter of union concern . . . best effectuates [§] 101(a)(2)'s purpose of promoting union democracy"); *Kazolias*, 806 F.3d at 51–52 (the LMRDA aims to "safeguard[] union democracy" and thus protects "speech of significant concern to the union membership as a whole" (internal citations omitted)). We agree with our sister circuits that "matters of union concern" implicate union democracy. Given this and our circuit's practice of applying First Amendment principles and tests to LMRDA cases, we hold that to determine whether speech "implicate[s] union democracy," we must look to the form, content, and context of the speech to find whether it touches on a "matter of union concern."

#### b. The Pickering test

In First Amendment cases, the *Pickering* balancing test is employed not to determine whether speech is protected, but to balance an individual's interest in engaging in *protected speech* against a countervailing party's (e.g., a college's, or in this case, the union's) interest in restricting the speech.[6] The first question is whether the speech is protected; but once a court determines that the speech is protected, the court is "required to [then] conduct a balancing of the parties' respective interests as set forth in *Pickering*." *Bonnell*, 241 F.3d at 821 (citing *Connick*, 461 U.S. at 149). The Eighth Circuit has also noted that under First Amendment doctrine, the *Pickering* balancing test applies only when the speech involves a matter of public concern. *See*

---

[6]Because the district court never reached the issue, Barger did not forfeit his argument that the *Pickering* test applies. In First Amendment doctrine, the *Pickering* balancing test applies only once speech is determined to be protected under the form-content-context test. The district court found that Barger's speech did not meet the form-content-context test, so it never reached the question of whether *Pickering* applies. As a result, the parties never argued which side would prevail if the *Pickering* test applied, so Barger did not have the opportunity to forfeit the argument. With that said, because the unions argued only that Barger's speech was not on a matter of union concern, we do not have the opportunity to reach *Pickering* here.

*Hylla*, 536 F.3d at 917 (noting that "when a government employee speaks 'as a citizen'—that is, outside the scope of employment—on 'matters of public concern,' the First Amendment offers protection if the speech survives the *Pickering* balancing test" and that "[s]imilar criteria must be applied in the LMRDA context as well."). But in *Hylla*, the Eighth Circuit held that the member's speech was not of union concern, so the court never reached the question of whether the *Pickering* balancing test applies when assessing whether protected speech may nevertheless be restricted under the LMRDA's "reasonable rules" proviso. *See id.* at 920; *see also id.* at 917 (noting that "the rights under § 101(a)(2) are subject to reasonable union rules that may restrict such rights, and thus § 101(a)(2) is not strictly parallel with the First Amendment even though § 101(a)(2) was patterned after it."). Likewise, in *Trail*, the Fourth Circuit ruled that the union member's speech did not implicate a matter of union concern and ended its inquiry there without discussing *Pickering*. *See Trail*, 710 F.3d at 548–59. Here, the district court, which held that Barger's speech was not a matter of union concern, had no occasion to reference, let alone apply, the *Pickering* test.

Because these cases have all held that the member's speech was not a matter of union concern, none of them reached the *Pickering* test. The *Bonnell* case, which the district court relied on (and which the parties cite here), is not an LMRDA case, but rather involved a college professor's free-speech right to make vulgar comments during class and publicly retaliate against a complaining student. *See* 241 F.3d at 802–06. In *Bonnell*, we agreed with the district court's conclusion that some of the professor's remarks and writings were of public concern, but nevertheless reversed the district court after conducting the *Pickering* balancing test. *Id.* at 811 ("[A]lthough we ultimately agree with the district court that Plaintiff's speech was protected as addressing a matter of public concern, the district court . . . erred when it found that Plaintiff's interests . . . outweighed the College's interests."). That case illustrates clearly that the question of whether the speech is a matter of public/union concern comes first; if the *Pickering* balancing test applies, it applies only after the first question is answered in the affirmative.[7]

---

[7]We note that in a case involving a union officer (as opposed to simply a union member), we held that § 101(a)(2) does not "incorporat[e] the entire body of First Amendment law," so "the analysis set forth in *Pickering* is not controlling." *Cehaich v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers*, 710 F.2d 234, 238 (6th Cir. 1983) (citation omitted). On the surface, this might foreclose Barger's invitation to extend *Pickering* to

### *c. This case*

We agree with the unions that the first step of analyzing an LMRDA free speech claim uses the form-content-context test to determine whether the speech at issue is a "matter of union concern." Although that does not preclude us from also finding that *Pickering* applies when determining whether protected speech may nevertheless be restricted under the "reasonable rules" proviso, we cannot make that decision here. The unions moved for summary judgment on one issue: whether Barger's speech was protected by one of the enumerated categories in § 101(a)(2). Their focus on this threshold issue, which we analyze using the form-content-context test, leaves us with no basis to decide what test applies under the second, "reasonable rules" prong. So, for this appeal, we review only whether Barger's speech is protected by the LMRDA § 101(a)(2) under the form-content-context test. Finding that it is, and finding that the unions failed to raise the "reasonable rules" proviso on summary judgment, we REVERSE in part.

### 3. The Form-Content-Context Test

The district court concluded that even though the content of the speech (*i.e.*, an allegation of overbilling) weighed in favor of finding it a matter of union concern, the form and the context (*i.e.*, Barger first raised the allegations in a private phone call out of self-interest, rather than "actively broadcasting his concerns to his fellow union members to remedy union corruption") sufficiently weighed against a finding that the speech was of "union concern." *Barger*, 398 F. Supp. 3d at 255–56. The district court reasoned that the "form and context of Barger's complaint stands in stark contrast to individuals who raise complaints of corruption at a union meeting or seek to publicize such information." *Id*. at 256. The court found the lack of "urgency" Barger displayed in raising his concerns and the lack of compelling evidence that his speech "was in the context of furthering union democracy" similarly cut against finding that his speech was protected. *Id*.

All of the out-of-circuit cases cited above found that the union member's speech was not of union concern, though each is distinguishable from Barger's speech in at least two respects.

---

LMRDA cases. But in *Cehaich*, we held that a union officer's speech was not protected. *Id.* at 239–40. Thus, the statement in *Cehaich* about *Pickering* was dictum.

First, as the district court acknowledged, the content of Barger's speech clearly involved a matter of union concern, *id.* at 255, while the out-of-circuit cases found that the content of the union member's speech was not of union concern. *See Trail*, 710 F.3d at 547 ("The content of [the union member's] speech—that the president and vice president viewed pornography on a Union computer on a single occasion—was not a matter of union concern."); *Hylla*, 536 F.3d at 919 (finding that the content of the union member's speech, which consisted of profanity toward a superior and a threat toward another employee, was not of union concern); *but see Kazolias*, 806 F.3d at 52–53 (finding that although the content of the union members' speech plausibly could "constitute speech that is protected" under the LMRDA, seeking redress only "for their personal grievance and ma[king] no attempt to publicize their grievances among the membership," the union members could not demonstrate that their speech was a matter of union concern).

Because the content of Barger's speech was of union concern, his speech undoubtedly would have been protected had he raised these concerns in a different form and context, *e.g.*, at a union meeting. And while Barger freely admits that he raised these concerns out of self-interest, "the motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor when considering whether an employee's statements may be fairly characterized as relating to any matter of political, social, or other concern to the community." *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997) (internal quotation marks and citation omitted). That is to say, "[w]hether an employee's statement is predominated by 'the employee's personal interest *qua* employee' is primarily a content-based inquiry, not an exclusively motive-based inquiry." *Id*. at 575. And "[t]he fundamental distinction recognized in *Connick* is the distinction between *matters* of public concern and *matters* only of personal interest, not civic-minded motives and self-serving motives." *Id*. (emphasis in original); *see also Bonnell*, 241 F.3d at 817–18 ("[A]lthough Plaintiff may have circulated [his writings] in the context of a self-serving motive, it nonetheless remains that the subject of [those writings] . . . inherently touches upon a matter of public concern.").

Furthermore, "motive" is noticeably absent in the form-content-context inquiry. The upshot is that the main reason the district court found that Barger's claim failed was not because it was self-serving (*i.e.*, not all whistleblowers must be purely altruistic, public-minded citizens

in order to receive protection), but because Barger did not publicize—or even try to publicize—his concerns. *See Barger*, 398 F. Supp. 3d at 255–56. And that conclusion leads to the second point that distinguishes Barger's situation from *Hylla* and *Trail*: the speed with which the union began disciplining and retaliating against Barger prevented him from having a bona fide opportunity to publicize his concerns.

On October 27th, Barger revealed to Lind that SPI was overbilling Dynegy and, later that same day, confirmed to Meier that he had revealed SPI's overbilling to Lind. Then, on October 30th, Meier—one of the few individuals to whom Barger confided his grievances[8]—brought charges against Barger that ultimately led to a guilty verdict and a $5,000 fine (later vacated on appeal). Meier acknowledged that he brought the charges because Barger repeatedly raised his concerns about overbilling to him. So, only three days separated Barger's first disclosing his concerns (albeit for private gain) and his being subjected to retaliation from the union for disclosing those concerns within the union. We find that, under the facts of this case, Barger's failure to publicize his speech cannot be used against him. We reach this conclusion because (1) it aligns with the purpose of the LMRDA, (2) if we were to hold otherwise, it would create perverse incentives for unions that are hostile to members' whistleblowing; and (3) it follows the best reading of § 101(a)(2).

First, finding that Barger's speech is not protected would contravene the LMRDA's purpose. "The principal reason for the enactment of the LMRDA was to correct widespread abuses of power and instances of corruption by union officials." *Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 44 (2d Cir. 1989). The "Bill of Rights" section of the LMRDA was added "to mollify fears that the bill before the Senate inadequately protected union members from abusive or coercive leadership practices." *Id.* Here, Barger faced immediate, serious retaliation by union leadership in the form of a $5,000 fine and months of litigation for making a legitimate accusation of union-sanctioned fraudulent billing. This is the type of speech the LMRDA was intended to protect.

---

[8]Meier also surreptitiously had Gressler listen in to the telephone call, while Barger aired his grievances, without Barger's knowledge. R. 97-30, Page ID #1300; R. 97-25, Page ID #1283.

Second, there may be many reasons that a union member would not wish to publicize his allegations (or would prefer to wait to publicize them), and punishing members for failing to publicize their allegations right away may create perverse incentives for the union. For instance, the union member might wish to privately express his concerns out of fear that publicizing them would lead to union retaliation, even if legal relief *might* be available down the line. Or a whistleblowing union member might choose to raise his concerns only to those committing the misconduct out of a belief that directly confronting the misconduct would more effectively ameliorate the situation than widely publicizing his concerns. Indeed, the first time Barger raised these concerns, he brought them to one of his union supervisors, Kahlenbeck. *See* R. 100, Page ID #1560–66. There might be a number of reasons that one aware of misconduct (*e.g.*, harassment in the workplace) might privately tell people before publicly revealing the issue (*e.g.*, to see if others have witnessed the same misconduct, or to seek advice about how—or even whether—to publicize their concerns). Obviously, Barger is an imperfect whistleblower. He revealed the overbilling because he had just been laid off and wanted a job. But it would be a mistake to ignore the fact that he had little opportunity to publicize these allegations against him before he faced retaliation (with serious financial implications) a mere three days after first privately raising his allegations.

To hold otherwise might cause absurd outcomes and create perverse incentives. For example, if a concerned union member seeks to have an issue resolved privately but soon thereafter faces retaliation, is that first private speech, once it is spoken publicly, never protected? In this case, what could Barger have done *after* facing retaliation in order to receive protection under the LMRDA? If he publicized his allegations after the initial charges were filed, would he need to face *further* retaliation in order to have an actionable claim under the LMRDA? Suppose the union had not retaliated within three days of Barger's privately raising his concern and one week later Barger publicized his allegations. If the union had then retaliated, his speech would have been protected. So, under this approach, by retaliating quickly against a union member, the union may be able to prevent the member from publicizing his speech to an extent sufficient to receive the LMRDA's protection. That is to say, a union's quick retaliation against a member's private—but not yet public—expression of criticisms or

allegations of wrongdoing may render the member defenseless against that retaliation, even though the LMRDA specifically sought to protect that type of speech.

Third, the text of § 101(a)(2) supports our holding. As alluded to above, there are four parts to § 101(a)(2): three expressly stated rights provided to union members, plus a qualification that the union may impose "reasonable rules" related to these three rights. Section 101(a)(2) begins by declaring that "[e]very member of any labor organization" is entitled to three rights:

1) "the right to meet and assemble freely with other members;"
2) "the right . . . to express any views, arguments, or opinions;" and
3) "the right . . . to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of the meetings."

The third right is partially limited; it permits the union to impose reasonable rules pertaining to union meetings, but there is no such qualification for the first two rights.

Finally, all three rights are subject to the following limitation:

*Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2). So while these three rights are written broadly, they all are subject to the union's adoption and enforcement of reasonable rules.

While § 101(a)(2) speaks, in part, to speech at meetings and elections, the structure of § 101(a)(2) makes clear that the restrictions on a member's right to express his views at a union election do not extend to a member's rights generally "to express any views." These "rights" are separated by semicolons, so it is easy to distinguish which restrictions apply specifically to one right and which apply generally to the entire subsection. Indeed, an alternative understanding of the statute (such as finding that a union member's speech is protected only in the context of elections and meetings) would render the second right—the right "to express any views,

arguments, or opinions"—meaningless, as the third right explicitly addresses a member's right to express "his views" at union elections and meetings. This interpretation is consistent with the Supreme Court's interpretation. *See Sadlowski*, 457 U.S. at 111–12 ("Congress adopted the freedom of speech and assembly provision in order to promote union democracy. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal."); *see also Local 911*, 301 F.3d at 474–75 (6th Cir. 2002) (noting that the Supreme Court has interpreted § 101(a)(2) using First Amendment principles, though acknowledging that they are not controlling).[9] We find that Congress's decision to provide union members the broad right to free speech—as confirmed by the structure of § 101(a)(2)—means that a member does not necessarily need to publicize his concerns at an election, union meeting, or any particular forum in order for his speech to be protected.

For these reasons, we find that Barger's speech was a matter of union concern. Because his speech was directly critical of union leadership and their policies, it also implicated union democracy as defined by *Sadlowski* and *Local 911*. Motive is not dispositive of the form-content-context inquiry, and if a union's retaliation is imposed swiftly so as to prevent a union member's ability to publicize his speech, then the lack of publicization cannot be used against the union member. Accordingly, we find that Barger's speech does meet the form-content-context inquiry and that, as a matter of union concern, it is thus protected under the LMRDA.

---

[9]The facts of Barger's case differentiate it from *Local 911*. *Local 911* held that the at-issue attempt to assemble for a boycott did not implicate union democracy because the restrictions preventing the boycott arose from the boycotter's "failure to obtain prior authorization" for the assembly. 301 F.3d at 475. Further, "the impetus of the thwarted boycott was [the target company's] employment practices, not the [union's] authorization process." *Id.* The court said that "Local 911 might have had a viable § 101(a)(2) claim if the [union] had abridged the right of its members to protest union policy concerning the authorization of economic action." *Id.*

Here, Barger complained to an IKORCC business agent—Meier—about a union leader's over-billing. His comments directly criticized union leadership and related to union policy. And, importantly, Meier brought charges against Barger because Barger complained to Meier and not solely because Barger tried to report the alleged fraud to an affected party. Barger's complaints to Meier constituted a union member's complaining to a higher-up about union policies and union leadership. The union retaliated against those protests. Therefore, *Local 911* also supports reversal.

### 4. The § 101(a)(2) Proviso

We next turn to the unions' interest in preventing Barger's speech. A defendant union bears the burden of establishing that the proviso—the right of a union to adapt and enforce reasonable rules, 29 U.S.C. § 411(a)(2)—applies. *See Black*, 970 F.2d at 1469; *see also Thompson*, 74 F.3d at 1507. Local 2, the IKORCC, and the UBC have not attempted to meet this burden here. They instead focused their arguments here and below on claiming that Barger's speech was not on a matter of union concern. We held above that this argument was incorrect. Because the unions failed to seek safe harbor in § 101(a)(2)'s proviso, it does not justify the restriction on Barger's speech. Barger's LMRDA claim therefore survives summary judgment.

### 5. Identifying the Responsible Parties

Because we find that Barger's LMRDA claim survives summary judgment, we must next determine *who* violated his free speech rights under the LMRDA.

#### a. Local 2 and the IKORCC

Barger claims that both Local 2 and the IKORCC violated his rights under the LMRDA. Meier, a member of Local 2 and the IKORCC's business agent, brought the charges against Barger, and the IKORCC returned a guilty verdict and imposed a $5,000 fine against Barger. Given Local 2's and the IKORCC's active involvement in the retaliation against Barger, we find that, if we take the facts in the light most favorable to Barger, he has raised a genuine issue of fact about whether both parties violated the LMRDA. Accordingly, we REVERSE the district court's granting of their motions for summary judgment.[10]

#### b. UBC

Unlike Local 2 and the IKORCC, the UBC was not involved with bringing the charges against Barger or the IKORCC's guilty verdict. And, in fact, the UBC later granted Barger's appeal, vacating the IKORCC's guilty verdict and $5,000 fine.

---

[10]Barger has not moved for summary judgment. Therefore, we decide only that IKORCC and Local 2 did not meet the Rule 56 standard.

The UBC's only alleged misconduct was that it intentionally stonewalled Barger's appeal. While the UBC appeared to enforce its procedural rules more strictly against Barger than against the IKORCC, *compare* R. 97-24, PageID #1279; R. 97-26, Page ID #1289 (not granting Barger a time extension and denying his first appeal attempt for not including receipt of his appeal fee), *with* R. 97-30, Page ID #1299–1301 (permitting the IKORCC to answer Barger's appeal well after the thirty-day requirement), Barger does not present an instance of the UBC's violating its own procedural rules.

Barger is upset that the UBC denied his appeal as not perfected because he did not include a receipt for payment of his appeal fee when the UBC knew, based on Barger's earlier grievance and the UBC's response to that grievance (finding that the appeal fee had been paid and receipt delivered, making the grievance moot), that Barger had in fact paid his appeal fee. But under the UBC's procedural rules, Barger was required to include a receipt of his appeal fee when filing his appeal, and he failed to do so. While the requirement might appear trivial, the UBC did not violate its rules—indeed, it appears to have followed them precisely. The UBC did later demonstrate leniency with the IKORCC by permitting it to file an answer past the thirty-day requirement. But Barger concedes that the UBC's procedural rules granted the UBC this discretion. He has not shown that the UBC intentionally stonewalled his appeal; indeed, the UBC granted his appeal, reversed the charges, and vacated the fine. For these reasons, we AFFIRM the district court's granting of UBC's motion for summary judgment.[11]

---

[11]Furthermore, we reject any argument that the UBC is liable under a respondeat-superior theory for the IKORCC's alleged misconduct. Barger does not expressly make that argument, other than to say that "Union Defendants enjoy an entwined and co-dependent relationship." Appellant Br. at 4. The UBC argues that the IKORCC and Local 2 are not agents of the UBC and that it should not be held liable for any misconduct they might have committed. UBC Br. at 17–20 (citing *Clark v. Teamsters Local Union 651*, 349 F. Supp. 3d 605, 618 (E.D. Ky. 2018) ("An international union and its affiliated local unions are legally distinct entities and should not be treated the same for liability purposes. A union may only be held responsible if it authorized, instigated, participated in, or ratified the actions of its agents. Common law agency principles govern whether an international union is liable for the action of its local affiliates in violating the LMRDA. The Court looks at the international's actual conduct to determine an international union's liability for its affiliates' actions." (citations omitted)). We agree with the UBC that national and international unions are not necessarily liable for regional and local affiliates' misconduct.

## B.  Claim II:  Barger's § 609 Retaliation Claim

Barger argues that a union's discipline of a union member for alleged slander is a *per se* violation of § 609 of the LMRDA, 29 U.S.C. § 529.  The district court rejected Barger's *per se* violation argument as an extension of its holding that Barger's speech was not a matter of union concern protected by the LMRDA.  *Barger*, 398 F. Supp. 3d at 254–56.  We agree with the district court that Barger cannot prevail on a § 609 claim, but on different grounds: Barger failed to timely raise this argument.[12]

Barger's third amended complaint did not put defendants on notice that he was bringing a freestanding § 609 claim apart from his conspiracy claim.  *See* R. 38-1, Page ID #329–32.  His first mention of the argument that charging a union member with slander is a *per se* violation of the LMRDA came in his response to the IKORCC's motion for summary judgment.  R. 124, PageID# 2155.  And Barger never specifically cited to § 609 in any motion, brief, or pleading until his reply brief on appeal.  *See* Reply Br. at 7.  The district court, accordingly, treated his per-se violation argument as an alternative legal theory supporting his § 101(a)(2) claim.[13]  *See Barger*, 398 F. Supp. 3d at 254–55.  Barger defends his failure to specifically cite to § 609 and argues that any alleged oversight does not affect his ability to still bring a § 609 claim:

> Defendants cannot reasonably claim to be surprised or otherwise disadvantaged by Barger's assertion of Section 609 claims. Barger's Third Amended Complaint clearly stated that he was subjected to a trial and fine for his protected conduct. These specific acts are clearly contemplated to be violations of Section 609 by the

---

[12]We note that a party's failure to bring a § 609 claim does not necessarily foreclose his receiving relief under his § 101(a)(2) claim, as the two are related, but still distinct, claims.  *See Finnegan*, 456 U.S. at 439 ("Although the intended relationship between §§ 102 and 609 is not entirely clear, it seems evident that a litigant may maintain an action under § 102—to redress an 'infringement' of 'rights secured' under Title I—without necessarily stating a violation of § 609."); *Cehaich*, 710 F.2d at 238 ("[W]e acknowledge that a cause of action may be maintained under section 102 quite apart from the cause of action under section 609.").  "Although the two sections may be somewhat duplicative as regards union discipline imposed in retaliation for the exercise of Title I rights, this seems due in large part to the fact that the provisions derived from different sources and were originally intended to serve quite different purposes."  *Finnegan*, 456 U.S. at 439 n.10 (see footnote for full explanation).

[13]Barger relies on *Petramale v. Local No. 17 of Laborers International Union*, 736 F.2d 13 (2d Cir. 1984), to support his "*per se* violation" theory.  The district court declined to adopt the Second Circuit's *per se* rule, finding *Petramale* factually distinguishable and unpersuasive.  *Barger*, 398 F. Supp. 3d at 254–55.  We need not decide whether the district court was right in this regard because we have already held that Barger's speech was protected under § 101(a)(2) using the narrower form-content-context test.

text of the LMRDA. Barger met his *Iqbal* and *Twombly* obligations, and the absence of a specific reference to Section 609 does not absolve Defendants.

*Id*. at 7 n.2.

As discussed above, Barger's speech was a matter of union concern. But we agree with the unions that Barger failed to bring a § 609 claim separate from his § 101(a)(2) claim under the LMRDA. Typically, pleading disputes center on whether the plaintiff pleaded enough facts to state a claim for relief that is plausible on its face. *See*, *e.g.*, *Patterson v. Novartis Pharm. Corp.*, 451 F. App'x 495, 497–98 (6th Cir. 2011). Here, Barger pleaded facts in his amended complaint that could plausibly allege a § 609 retaliation claim (largely because the same facts underlie his § 101(a)(2) claim), *see* R. 38-1, Page ID #326–27, 329, but he cites only § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), not § 609 of the LMRDA, 29 U.S.C. § 529. *See id*. at 329–30. He never raised § 609 at all until his reply brief on appeal. Barger failed to "give the defendant[s] fair notice of what the . . . claim is." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). He, therefore, never properly brought a § 609 retaliation claim.

## C. Claim III: Conspiracy

"In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 446 (6th Cir. 2012) (quoting *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)). Finding that there was no underlying LMRDA violation, the district court concluded that "the conspiracy claim necessarily fails." *Barger*, 398 F. Supp. 3d at 256. However, because we hold that Barger's § 101(a)(2) claims against Local 2 and IKORCC survive summary judgment, Barger's conspiracy claim cannot fail on those grounds.

Barger alleged that three parties conspired against him: Local 2, the IKORCC, and the UBC. But Barger forfeited his conspiracy claim against Local 2 at the motion-to-dismiss stage. *See* R. 68, Page ID #647–48 (Local 2's Motion to Dismiss); R. 71, Page ID #661–66 (Barger's Response); R. 72, Page ID #699 (Order granting Motion to Dismiss). And Barger did not appeal

the district court's decision granting Local 2's motion to dismiss. The IKORCC claims that Barger can therefore argue on appeal only that there was a conspiracy between the UBC and the IKORCC, which Barger does not contest. Moreover, Barger does not put forth any arguments in support of his conspiracy claim except to repeat his claim that the district court erred by finding that there was no underlying violation; Barger does not argue the other elements of a conspiracy claim. *See Bard v. Brown County*, 970 F.3d 738, 750 (6th Cir. 2020) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited."). As explained in Part II.A.5.b, *supra*, the UBC did not commit any misconduct; because UBC did not violate the LMRDA, its own conduct cannot provide the predicate act for a conspiracy, which requires an underlying LMRDA violation.

But that is not necessarily lethal to Barger's conspiracy claim. Although a conspiracy claim requires a "malicious combination" between "two or more" parties, *Lee*, 692 F.3d at 446 (quoting *Universal Coach*, 629 N.E.2d at 33), this circuit previously allowed an Ohio conspiracy claim to survive summary judgment despite only one party's having committed the underlying unlawful act. *Id.* at 449. Although we are skeptical that Barger has provided sufficient proof of an agreement, we VACATE the district court's grant of summary judgment on Barger's civil conspiracy claim against the IKORCC and the UBC and REMAND to permit the district court to reconsider whether Barger's civil conspiracy claim should survive summary judgment given our holding that his underlying LMRDA claim does.

## III. Conclusion

For the foregoing reasons, we REVERSE summary judgment for the IKORCC and Local 2 on Barger's § 101(a)(2) claim, AFFIRM summary judgment for the UBC on Barger's § 101(a)(2) claim, AFFIRM summary judgment for the IKORCC, the UBC, and Local 2 on any § 609 retaliation claim that could be read into Barger's complaint, VACATE summary judgment for the IKORCC and the UBC on Barger's civil conspiracy claim, and REMAND for proceedings consistent with this opinion.